## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 14-cv-20524-KING

PAVARANI CONSTRUCTION CO. (SE) Inc.,
 a Delaware Corporation, individually,
and for the use and benefit of
STEADFAST INSURANCE COPMANY,
a Delaware Corporation,

       Plaintiff,

vs.

ACE AMERICAN INSURANCE COMPANY,
a Pennsylvania Corporation,

       Defendant.

_____/

### ORDER DENYING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

       THIS CAUSE comes before the Court upon Defendant, ACE American Insurance Company's, two motions for summary judgment: ACE's Amended Motion for Summary Judgment (DE 35) and ACE's Motion for Summary Judgment relating to "completed products coverage" (DE 66). The motions are fully briefed.[1]

       The undisputed material facts are as follows. Pavarani was the general contractor contracted by developer 900 Biscayne, LLC,[2] to construct 900 Biscayne Bay Condominium, a 63-floor, mixed-use condominium tower. DE 35, at 2. Pavarani is covered by three relevant insurance policies: (1) American Home Assurance Company's commercial general liability policy; (2) ACE's Excess Liability policy; and (3) Steadfast Insurance Company's Subguard

---

[1] Plaintiff, Pavarani Construction Co. (SE), did not object on procedural grounds to ACE's filing of a second motion for summary judgment.

[2] This company is an affiliate of Terra-ADI International Bayshore, LLC, which is named on two of the relevant insurance policies. DE 35, at 2.

policy. American Home's policy contains a $2 million "each occurrence limit" and a $4 million "general aggregate limit." DE 35 ¶ 11. ACE's policy has a $25 million "each occurrence" limit and a $25 million aggregate limit. *Id.* at ¶ 9. The Subguard policy contains a $25 million "Each Loss limit of insurance" and a $25 million "Aggregate limit of insurance." *Id.* at ¶ 14. It is undisputed that the ACE policy is excess over American Home's commercial general liability policy. *Id.* at ¶11.

Pavarani hired subcontractors to work on the condominium project. At least one of them performed deficient work by failing to install or by improperly locating reinforcing steel in the concrete masonry unit walls. DE 46 ¶ P4. According to Pavarani, this deficient work caused "damage to the exterior stucco (cracking, delamination, and falling); water intrusion in the penthouse enclosure; and cracking in the concrete of columns, beams, and shear walls." *Id.*

Pavarani seeks indemnification from ACE under the ACE policy for certain repairs necessitated by the subcontractors' deficient work. After exhausting the American Home policy's limits, Pavarani tendered a claim to ACE, which refused to pay for any costs associated with the repairs. *Id.* at ¶ P15. Steadfast agreed that it would participate in funding the repairs—and has done so—under the Subguard policy. *Id.* at ¶ P20. In return, Pavarani agreed to pursue ACE for indemnification on Steadfast's behalf and to reimburse Steadfast for payments that Steadfast made to fund the repairs. *Id.* Steadfast assigned subrogation rights to Pavarani and the instant action followed. Pavarani seeks more than $23 million from ACE in costs, fees, and prejudgment interest. *Id.* at ¶ 7.

I.       **Summary Judgment Standard**

Summary judgment is appropriate where the pleadings and supporting materials establish that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is "material" if it is may determine the outcome under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmoving party must show specific facts to support that there is a genuine dispute. *Id.* at 256. On a motion for summary judgment, the court must view the evidence and resolve all inferences in the light most favorable to the nonmoving party. *Id.* at 255. In reviewing the record evidence, the Court may not undertake the jury's function of weighing the evidence or undertaking credibility determinations. *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1237 (11th Cir. 2010).

II.      **Standards for Construing Insurance Contracts**

> Our interpretation of insurance contracts . . . is governed by generally accepted rules of construction. Insurance contracts are construed according to their plain meaning, with any ambiguities construed against the insurer and in favor of coverage. *See Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So.2d 528, 532 (Fla.2005). Further, "in construing insurance policies, courts should read each policy as a whole, endeavoring to give every provision its full meaning and operative effect." *Auto–Owners Ins. Co. v. Anderson*, 756 So.2d 29, 34 (Fla.2000). Accordingly, "[a]lthough exclusionary clauses cannot be relied upon to create coverage, principles governing the construction of insurance contracts dictate that when construing an insurance policy to determine coverage the pertinent provisions should be read *in pari materia.*" *CTC Development*, 720 So.2d at 1074–75 (citations, alteration, and internal quotation marks omitted).

*U.S. Fire Ins. Co. v. J.S.U.B., Inc.*, 979 So. 2d 871, 877 (Fla. 2007).

### III.   ACE's Amended Motion for Summary Judgment (DE 35)

In ACE's Amended Motion for Summary Judgment, it argues that coverage under the ACE policy is barred as a matter of law because Pavarani did not repair "property damage," which the ACE policy covers; but rather repaired a subcontractor's deficient work, which the ACE policy does not cover. In order to understand the scope of coverage under the ACE policy, it must be read together with the American Home policy to which the ACE policy is excess.[3] Section I (Coverages) of the American Home policy provides, "We will pay those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies." DE 35-3, at 9. "Property damage" is defined as "[p]hysical injury to tangible property, including all resulting loss of use of that property," and "[l]oss of use of tangible property that is not physically injured." *Id.* at 23. The policy covers "property damage" only if the "property damage" is caused by an "occurrence." *Id.* at 9. "'Occurrence' means an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.* at 22.[4]

---

[3] By the ACE policy's terms, it "only applies to injury or damage covered by the UNDERLYING INSURANCE . . . . The Definitions, Terms, Conditions, Limitations, and Exclusions of the UNDERLYING INSURANCE, in effect at the inception date of this policy, apply to this coverage unless they are inconsistent with provisions of this policy . . . ." DE 35-1, at 4. "UNDERLYING INSURANCE means the policy or policies of insurance as described in the Declarations and Schedule of Underlying Insurance forming a part of this policy." *Id.* at 7. The Schedule of Underlying Insurance (Revised) lists a Commercial General Liability Policy, with policy number GL 933-3498, and with a policy term of October 25, 2004, to January 25, 2008. *Id.* at 2. This policy is the American Home policy to which the ACE policy is excess. This is undisputed. *See* DE 35, at 5 ¶ 11. The Court notes, however, that the policy number and policy term listed in the ACE policy's Schedule of Underlying Insurance (Revised) do not match the policy number and policy term listed on the face of the American Home policy; and the parties do not explain this discrepancy.

[4] The ACE policy's definition of "occurrence" is identical. DE 35-1, at 7.

4

ACE correctly argues that, under the above provisions, and under Florida Supreme Court precedent,[5] the ACE policy covers "property damage" but does not cover repairs to a subcontractor's deficient work. However, Pavarani insists that it "seeks reimbursement under the ACE Policy for damages *resulting from* the defective work of Pavarani's subcontractors." DE 46 ¶ 7 (emphasis added):

> [M]issing and improperly located reinforcing steel in the concrete masonry unit ("CMU") walls was causing excessive movement of the building. This movement resulted in: damage to the exterior stucco (cracking, delamination, and falling); water intrusion in the penthouse enclosure; and cracking in the concrete of columns, beams, and shear walls.
> . . .
> The Repair addressed the existing damage to the Project . . . . The Repair did not fix the defective work that led to the building movement and resulting damage. The Repair did not install reinforcing steel in places where it was missing, nor did the Repair relocate mislocated steel.

*Id.* at ¶¶ P4, P7. These assertions, supported by affidavit,[6] create an issue of material fact. If credited by the factfinder, they show that Pavarani's repairs were of property damage caused by defective work—as opposed to repairs of the defective work itself.[7]

ACE also argues that its policy's coverage could not have been triggered because it is excess over the Subguard Policy, and any damages that may be covered by both of the policies have already been paid by Steadfast under the Subguard policy. ACE's arguments are unconvincing. ACE cites to Section I.A. (Coverage) of its policy, which states in relevant part that "WE will pay on YOUR behalf the ULTIMATE NET LOSS in excess of the

---

[5] *See U.S. Fire Ins. Co. v. J.S.U.B., Inc.*, 979 So. 2d 871 (Fla. 2007).

[6] The affidavit is by William B. Noonan, Vice President, Risk Management, of Structure Tone Southwest, an affiliate of Pavarani. DE 46-1, at 2. The Court previously disallowed Noonan from testifying as to certain matters (DE 101), none of which are encompassed by the portions of Noonan's affidavit offered to support Pavarani's quoted assertions.

[7] ACE has not demonstrated the applicability of any exclusions in the ACE policy.

applicable limits of the UNDERLYING INSURANCE . . . ." DE 35-1, at 4. As noted above, however, "UNDERLYING INSURANCE" refers to the American Home policy, not the Subguard policy. *See supra* note 3. ACE also highlights, in Reply, the "Other Insurance" clause in the Subguard policy:

> This insurance shall be excess only and non-contributing over any other valid and collectible insurance available to you, whether such other insurance is stated to be primary, pro rata, contributory, excess, contingent, or otherwise, **unless such other insurance is written only as a specific excess insurance over the limits of insurance provided in this Policy**.

DE 35-2, at 9 (emphasis added).[8] ACE argues that the Subguard policy is not excess over the ACE policy (and therefore must be exhausted before the ACE policy is triggered) because the emphasized language in the above provision embraces the ACE policy. This argument fails. Under no reading of the ACE policy is it written **only** as a **specific** excess insurance over the limits of insurance provided in **the Subguard policy**. ACE's Amended Motion for Summary Judgment (DE 35) is denied.

## IV.   ACE's Second Motion for Summary Judgment (DE 66)

In ACE's second motion for summary judgment (DE 66), it argues that coverage is barred under the ACE policy because "completed products coverage" does not exist for Pavarani's claim. The policy provisions that are relevant to this argument follow.

The ACE policy period, originally ending on January 25, 2008, was extended by an amendatory endorsement to May 31, 2008, in exchange for an additional premium of

---

[8] The ACE policy contains a substantively identical provision. DE 35-1, at 9 ("IF OTHER INSURANCE, whether collectible or not, is available to the INSURED covering a loss that is also covered by this policy, other than a policy that specifically written to apply in excess of this policy, the insurance afforded by this policy shall apply in excess of and shall not contribute with such OTHER INSURANCE.").

$75,000. DE 90 ¶ 10. By a separate endorsement titled "Products/Completed Operations Extension Period," it was agreed that a five-year extension of the Products/Completed Operations Hazard "will commence at the time that the project has been completed and accepted by the owner." DE 35-1, at 13. The endorsement added the following definition to the ACE policy: "**PRODUCTS/COMPLETED OPERATIONS HAZARD means** all injury or damage covered by and defined as being within the PRODUCTS/COMPLETED OPERATIONS coverage pursuant to the **UNDERLYING INSURANCE**." *Id.*

ACE argues that the terms "completed and accepted by the owner," as used in the endorsement, "are clear and unambiguous on their face," DE 66, at 9, and that those words necessarily equal the date that the final certificate of occupancy was issued—January 29, 2009. ACE also argues that the alleged property damage that gives rise to Pavarini's claim for indemnity was discovered in July 2008. ACE concludes that because the claimed damages occurred during a time after the policy term ended (May 31, 2008), but before the Products/Completed Operations Extension Period began (January 29, 2009), they are not covered.

Other than the dictionary and ACE's *ipse dixit*, ACE offers no support for its contention that the phrase "completed and accepted by the owner" as used in the endorsement necessarily equals the date that the final certificate of occupancy was issued. Pavarini disputes this proposition. It argues that the Products/Completed Operations Extension Period began on the earlier date of May 22, 2008, because "as of May 22, 2008, when the last TCO [temporary certificate of occupancy] was issued, the entire Project was substantially complete and could be used by the Owner for its intended purpose." DE 90 ¶ 6. As of May 22, 2008, Terra-ADI and condominium unit owners took control of the units, and

7

Terra-ADI sold multiple units to individual condominium unit owners between May 22 and May 30, 2008. *Id.* at ¶¶ P6–P7. The words "completed" and "accepted" are not listed in the definitions sections of the applicable policies, and the only place in the policies where "completed" is given a meaning is in the Home Assurance policy's definition of "Products-completed operations hazard" (which is incorporated into the ACE policy by the endorsement), under which "your work" can be deemed "completed" "[w]hen that part of the work done at a job site **has been put to its intended use** . . . ." DE 35-3, at 23 (emphasis added).

In the absence of controlling authority as to the meaning of "completed and accepted by the owner" as used in the ACE policy's endorsement, and given Pavarani's supported assertions as to the state of affairs in May 2008 when the temporary certificates of occupancy were issued, there are genuinely disputed issues of material fact as to when the Products/Completed Operations Extension Period began. Pavarani's assertions, if credited by the factfinder, show that the Extension Period began before July 2008. The Court's resolution of this issue makes it unnecessary to reach the parties' arguments as to whether the alleged property damage was discovered in July 2008 or at some other time.

## V.   Conclusion

Therefore, it is **ORDERED, ADJUDGED, and DECREED** as follows:

1. That ACE's Amended Motion for Summary Judgment **(DE 35)** be, and the same is, hereby **DENIED**.

2. That ACE's Motion for Summary Judgment as Completed Products Coverage Does Not Exist for the Plaintiff's Claims **(DE 66)** be, and the same is, hereby **DENIED**.

8

**DONE and ORDERED** in Chambers at the James Lawrence King Federal Justice Building and United States Courthouse, Miami, Florida, this 25th day of February, 2015.

JAMES LAWRENCE KING
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF FLORIDA

cc:    All Counsel of Record

9