UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 1:14-cv-20524-JLK

PAVARINI CONSTRUCTION CO. (SE), Inc.,
a Delaware Corporation, individually,
and for the use and benefit of
STEADFAST INSURANCE COMPANY,
a Delaware Corporation,

       Plaintiff,

vs.

ACE AMERICAN INSURANCE COMPANY,
a Pennsylvania Corporation,

       Defendant.

_____/

**PLAINTIFF PAVARINI CONSTRUCTION CO. (SE), INC.'S
MOTION FOR SUMMARY JUDGMENT
AND INCORPORATED MEMORANDUM OF LAW**

Pursuant to Federal Rule of Civil Procedure 56, Local Rule 56.1, and the Court's instruction, Plaintiff Pavarini Construction Co. (SE), Inc. ("Pavarini") hereby moves for summary judgment on all of its claims in this litigation against Defendant ACE American Insurance Company ("ACE"), and in support thereof states as follows:

## I.      INTRODUCTION

Pavarini was the general contractor for the 900 Biscayne Bay Condominium Project (the "Project"), a 63-story luxury condominium building in downtown Miami.  More than a year after the Project was completed, it was discovered that two of Pavarini's subcontractors, Alan W. Smith, Inc. ("AWS") and TCOE Corporation ("TCOE"), failed to properly install reinforcing steel within the building, which weakened the building's structure and resulted in excessive movement of building components.  This caused increasing damage to the Project's stucco façade, its concrete columns, beams, and shear walls, and its mechanical penthouse enclosure on the roof, all of which had been installed by different subcontractors.  This damage put the Project at risk for structural failure and mandated evacuation.

The Project Owner and residents demanded that the damage be repaired.  Because the costs of repairing damage caused by a subcontractor's defective work are covered under the commercial general liability ("CGL") policies purchased by the Owner as part of an Owner Controlled Insurance Program ("OCIP"), Pavarini tendered a claim to the OCIP CGL insurers – American Home Assurance Company ("American Home") and Defendant ACE American Insurance Company ("ACE"), both of which insured Pavarini as well as AWS and TCOE.  Both insurers were continuously updated regarding the damage to the Project and life safety concerns, and both consented to the planned remediation, which was designed to settle the Owner's claims against Pavarini.  However, neither insurer agreed to pay for the remediation.

Neither Pavarini nor the responsible subcontractors had the resources to fund the remediation effort, but failure to address the damage would have jeopardized the structural integrity of this occupied high-rise condominium, and eventually forced its evacuation. Therefore, Pavarini sought interim funding from Steadfast Insurance Company ("Steadfast") under a subcontractor default insurance policy known as "Subguard." Subguard, which is similar to a subcontractor bond, covers Pavarini's (but not the responsible subcontractor's) costs to complete a subcontractor's contractual obligations due to a default of performance or payment. Here, the OCIP insurers' failure to pay for the remediation of the damage caused by their insureds (the subcontractors) caused the subcontractors to default on their contractual obligations to Pavarini, which in turn allowed Pavarini to trigger the Subguard Policy. Pavarini then entered into a Payment Agreement with Steadfast whereby Steadfast agreed to advance payments for the remediation, and Pavarini agreed to pursue its preexisting claims against the OCIP insurers and repay Steadfast from any recovery. In that Agreement, Steadfast also confirmed its right under the Subguard Policy to seek subrogation from any party responsible for the damage, including the negligent subcontractors (AWS and TCOE) and/or their general liability insurers (American Home and ACE).

Subsequently, American Home, the primary CGL insurer in the OCIP, acknowledged its coverage obligations and paid Pavarini its full $2 million limit toward the remediation. Pavarini paid that $2 million to Steadfast pursuant to the terms of the Payment Agreement. ACE, however, refused to make any payment. Steadfast later assigned its rights of subrogation to Pavarini, and this action followed.

2

As explained below, the undisputed facts show that the damages at issue are covered under the ACE Policy and should have been paid by ACE, and that ACE's refusal to pay those damages is a breach of contract that entitles Pavarini to the damages sought in this litigation.

## II.  FACTUAL BACKGROUND[1]

### A.  The Project

The Project is a 63-story, 516-unit, luxury condominium building overlooking Biscayne Bay.  (SOF ¶ 1).  Pavarini was the general contractor for the Project pursuant to a contract with the Project Owner dated December 30, 2004.  (SOF ¶ 2).  Pavarini performed no construction work on the Project; all construction was performed by subcontractors.  (SOF ¶ 11).  AWS was the subcontractor responsible for the installation of concrete masonry unit ("CMU") walls[2] and certain reinforcing steel.[3]  (SOF ¶ 12).  TCOE was the subcontractor responsible for the supply and installation of reinforcing steel within the cast-in-place concrete columns, beams, and shear walls.[4]  (SOF ¶ 13).  Neither AWS nor TCOE was responsible for installing (1) the cast-in-place

---

1  Pavarini's accompanying Statement of Material Facts (hereinafter "SOF") is incorporated herein by reference.

2  A CMU is a rectangular concrete block with hollow cells, i.e., what people generally picture as a "cinder block."  (SOF ¶ 3).  A CMU wall is a wall built by laying staggered rows of CMUs on top of each other with mortar in between.  (SOF ¶ 7).  At the Project, the concrete structural elements formed a framework (like a picture frame) that was in-filled with CMUs to create the exterior CMU walls.  (SOF ¶ 7).

3  Reinforcing steel refers to forms of steel embedded in or attached to the CMU walls and concrete structural elements throughout the Project.  (SOF ¶ 8).  Reinforcing steel includes vertical and horizontal bars embedded in the CMU walls and concrete structural elements, as well as anchors that attached the CMU walls to the concrete structural elements.  (SOF ¶ 8).

4  Cast-in-place concrete is concrete that is poured at a construction site.  (SOF ¶ 4).  At the Project, cast-in-place concrete was used to create columns, shear walls, beams, and slabs. Columns and shear walls are vertical structural elements.  (SOF ¶ 5).  A column is generally square or round when viewed from above, and a shear wall appears to be an elongated, rectangular column.  (SOF ¶ 5).  Beams and slabs are horizontal structural elements.  (SOF ¶ 6).  A beam is like a column placed on its side, and slabs form the floors of the building.  (SOF ¶ 6).

3

concrete elements, (2) the mechanical penthouse enclosure on the roof, or (3) the stucco façade. (SOF ¶ 14).

**B.**     **Project Insurance and Protection from Subcontractor Default**

The Owner insured the Project through what is known as an Owner Controlled Insurance Program or OCIP. (SOF ¶ 17). Traditionally, construction projects were insured under a system where each project participant (e.g., the owner, the general contractor, and every subcontractor) was required to purchase its own commercial general liability ("CGL") insurance to insure that project participant against claims of property damage and/or bodily injury. Int'l Risk Mgmt. Inst., *The Wrap-Up Guide* 2 (Jack P. Gibson ed., 4th ed. 2006) (hereinafter "*Wrap-Up*"). CGL policies, however, are not all created equal. *See id.* While certain language is often standard, rarely are any two policies identical. *See id.* Difference in the scope of coverage afforded to different project participants often times resulted in potentially large uninsured claims and project losses. *Id.*

To avoid these types of problems, the contracting and insurance industry created the concept of controlled insurance programs like the OCIP at issue here. *See id.* Under an OCIP, the owner purchases a single set (primary and excess layers) of CGL policies for the project; that set of policies insures all of the major project participants (e.g., the owner, the general contractor, and most or all subcontractors) against claims of property damage and/or bodily injury. *Id.*; Patrick J. Wielinski, *Insurance for Defective Construction* 484 (3d ed. 2012) (hereinafter "Wielinski"); (*see* SOF ¶ 18). In this way, the owner can ensure that there is "consistent and broad insurance protection for all site contractors during the term of the project," which can be particularly important in large-scale construction projects. (SOF ¶ 19); *see* Wielinski, at 484. By insuring most or all project participants under one set of policies, OCIPs "benefit all contractors, employees, [the Owner,] and [the] public" from the risk of inconsistent coverage and potentially

uninsured losses.  (SOF ¶ 19); *see* Wielinski, at 484.  Each insured under an OCIP is a separate insured, meaning that it is treated as if it is the only insured under each individual policy.  *Wrap-Up*, at 66-67; (*see* SOF ¶ 18).

American Home provided the primary layer of CGL coverage for the Project OCIP, with limits of $2 million per occurrence and $4 million in the aggregate.  (SOF ¶ 20).  ACE provided the first layer of excess CGL coverage, with limits of $25 million per occurrence and in the aggregate.  (SOF ¶ 22).  The American Home and ACE Policies provided coverage both while the Project was under construction and for an additional five years thereafter (referred to as the five year products-completed operations extension).  (SOF ¶¶ 20-23).  Pavarini, AWS, and TCOE are all insureds under the OCIP policies.  (SOF ¶ 18).

Independent of any insurance, subcontractors on construction projects are generally required to provide payment and performance bonds to guarantee their contractual obligations.  Wielinski, at 389; (SOF ¶ 24).  For example, if a subcontractor failed to complete its scope of work or otherwise defaulted on its contractual obligations, the bonding company (surety) would step in and complete or otherwise satisfy that defaulting subcontractor's obligations.  Wielinski, at 389-90.  The surety then seeks recovery of its payments/losses due to the default from any responsible parties, including the defaulting subcontractor itself.  *Id.*

Traditionally, each subcontractor provided its own payment and performance bonds.  *Id.* at 389.  As a substitute for, or an alternative to, traditional subcontractor payment and performance bonds, Steadfast created its "Subguard" program.  *Id.* at 487.  Subguard was created to operate in a similar fashion as a traditional bond.  *Id.*; (*see* SOF ¶ 25).  Like a subcontractor bond, Subguard is triggered by a subcontractor's contractual "default" of performance.  (SOF ¶ 26); Wielinski, at 389-90, 487.  Also like a subcontractor bond, Subguard provides protection

only to the general contractor, not to the subcontractor.  (SOF ¶ 26); Wielinski, at 390.  Indeed, Steadfast, under the terms of the Subguard Policy, maintains the right to subrogate against responsible parties (including the defaulting subcontractor and its insurers) to recover any losses paid.  (SOF ¶ 27); see Wielinski, at 397-401.  Here, separate and apart from the Project OCIP, Pavarini required that each of its subcontractors either provide traditional payment and performance bonds or be enrolled in Pavarini's Subguard program.  (SOF ¶ 24).  Both AWS and TCOE were enrolled in Subguard, rather than providing payment and performance bonds.  (SOF ¶ 28).

### C.    Project Completion

Construction of the Project began in 2005.  (SOF ¶ 29).  On March 31, 2008, the Project architect certified that the entire Project was "in compliance with the approved plans and other approved permit documents" and recommended that the entire building be granted a Temporary Certificate of Occupancy ("TCO").  (SOF ¶ 30).  A TCO allows a building to be put to its intended use.  (SOF ¶ 31).  The City of Miami issued a final TCO for the Project on May 22, 2008, "certif[ying] that the work has been completed."  (SOF ¶ 32).  May 22, 2008, was also the record date of substantial completion.  (SOF ¶ 33).  At that time, the Owner began selling condominium units, and the Owner and individual unit owners took control of the building.  (SOF ¶ 33).

### D.    Discovery of Defective Work and Continuing  Resulting Damage

In February 2009, Pavarini retained Bureau Veritas to complete a preliminary investigation of complaints regarding cracked stucco on the building's façade.  (SOF ¶ 36).  Routine minor cracking had been reported and repaired by Pavarini's stucco subcontractor, but over time new cracks re-appeared and became more significant.  (SOF ¶ 37).  Bureau Veritas issued a report dated June 1, 2009, which identified missing and improperly installed reinforcing

steel and concluded that the stucco cracking was due to differential movement between building elements, not issues with the stucco application itself.  (SOF ¶¶ 38-39).

In the fall of 2009, the Owner demanded that Pavarini repair the damage to the building. (SOF ¶ 41).  Pavarini promptly gave notice to American Home (the primary layer OCIP insurer) on October 13, 2009.  (SOF ¶ 42).  The Owner, through its broker, also provided notice of damage to the OCIP insurers.  (SOF ¶ 43).  By mid-2010, it became clear to Pavarini that the cost to repair the damage was going to exceed the primary layer of CGL coverage ($2 million), and Pavarini notified ACE of the claim.  (SOF ¶¶ 44-45).  ACE acknowledged receipt of the claim by letter dated August 31, 2010.  (SOF ¶ 45).  In December 2010, the Owner served Pavarini with a formal demand to repair all of the damage pursuant to Section 558, Florida Statutes (a "§ 558 Notice").  (SOF ¶ 46).

In response to the § 558 Notice, Pavarini retained structural engineer Allyn Kilsheimer of KCE Structural Engineers, P.C. ("KCE"), a world-renowned expert on buildings in distress. (SOF ¶ 47).  Pavarini also requested that Bureau Veritas further investigate the cause and nature of the damage.  (SOF ¶ 47).  Through the use of Ferroscan, ground penetrating radar ("GPR"),[5] and destructive testing, Pavarini's experts determined that a significant amount of reinforcing steel was either missing or improperly installed throughout the building, including within its critical concrete structural elements.  (SOF ¶ 48).  This missing and improperly installed reinforcing steel in the concrete columns, beams, and shear walls, and in the CMU walls, had compromised the building's structural support system.  (SOF ¶ 49).  This resulted in excessive

---

[5]   Ferroscan and GPR are techniques that, through the use of handheld devices, allow experts to determine the presence of reinforcing steel and grout in CMU walls and concrete structural elements.  (SOF ¶ 9).  Drawings depicting the location of reinforcing steel are then created from the Ferroscan and GPR readings.  (SOF ¶ 10).

movement of building components, which, in turn, caused stucco debonding[6] and cracking; worsening cracking of cast-in-place concrete elements (columns, beams, and shear walls); and cracking in the mechanical penthouse enclosure on the roof, which led to water intrusion.  (SOF ¶ 50).  Indeed, ACE's own structural engineering expert agrees that the missing and improperly installed reinforcing steel caused cracking in the Project's stucco and critical concrete structural elements.   (SOF ¶ 51).

     **E.**      **Remediation Efforts and the Panel System**

     Over time, damage at the Project continued to worsen.  (SOF ¶ 52).  Stucco damage became more pervasive, allowing water to penetrate through to the interior of the building and causing stucco to fall off the side of the building. (SOF ¶ 53).  In one instance, stucco fell off the side of the building onto an occupied pool deck, which was then closed.  (SOF ¶¶ 53-54).  As an interim measure, and to address these immediate life safety concerns, Pavarini installed hurricane netting on the impacted stucco walls of the Project to prevent falling debris from injuring residents and causing additional property damage.  (SOF ¶ 54).  These life safety measures (referred to as "Phase 1" of the remediation efforts) were completed in 2011. (SOF ¶ 54).

     Pavarini then retained KCE and Wiss Janney Elstner Associates, Inc. ("WJE"), with the knowledge and consent of both American Home and ACE, to design a plan to repair the damage at the Project and to settle the Owner's § 558 claim, resolving Pavarini's legal liability to the Owner.  (SOF ¶¶ 55-56).  The result was a structural steel exoskeleton and metal panel façade (the "Panel System") that would be constructed on the exterior of the building. (SOF ¶ 57).  The Panel System addressed the existing physical damage to building components and prevented

---

[6]   When stucco is directly applied to an underlying surface, as it was at the Project, it must adhere to that surface.  (SOF ¶ 10).  Debonding means that the stucco is no longer adhered and has begun to pull away from the underlying surface.  (SOF ¶ 10).

further damage – and potentially catastrophic failure of the building over time – by providing the structural support that the concrete columns, beams, and shear walls should have provided but did not because of the cracking caused by the missing and improperly installed steel.  (SOF ¶ 57).  The Panel System also stopped the cracking of and strengthened the damaged concrete elements; encapsulated the damaged stucco; and mitigated against further loss, including physical damage to other building components and the risk that the building would have to be evacuated.  (SOF ¶ 58).

Installation of the Panel System (referred to as "Phase 2" of the remediation efforts) began in December 2011.  (SOF ¶ 59).  The installation required drilling anchor bolts into the existing concrete structure from the pool deck area on the 17th floor all the way up to the 63rd floor on four separate exterior faces of the building.  (SOF ¶ 60).  Structural steel supports were then fabricated and attached to those bolts.  (SOF ¶ 60).  After the steel supports were installed, metal stud framing was placed between the steel supports, and the metal panels were attached.  (SOF ¶ 60).  The Panel System as designed and installed did not correct any defective work.  (SOF ¶ 61).  Specifically, all missing reinforcing steel remains missing and all improperly installed reinforcing steel remains in place.  (SOF ¶ 61).

Because of the unique and custom nature of the Panel System, and the fact that it was being constructed on suspended scaffolding on the outside of a fully-occupied residential building in downtown Miami, the work was complicated and time consuming.  (SOF ¶ 62).  The total cost of the investigation, installation of the hurricane netting, installation of the Panel System, all roof repairs, and other costs arising from the remediation has exceeded $25 million.  (SOF ¶ 63).

### F.      Funding for the Remediation Efforts

Although American Home accepted Pavarini's defense after the Owner served Pavarini with a § 558 Notice, American Home initially refused to provide indemnity.  (SOF ¶ 64).  Pavarini nevertheless continued to provide both American Home and ACE with detailed updates regarding the investigation, continuing and significant property damages, and life safety concerns, as well as detailed updates regarding the proposed plans for remediation.  (SOF ¶ 65).  By the spring of 2011, KCE determined that, because the damage had become so severe, hurricane netting needed to be installed to protect the residents and prevent additional damage prior to hurricane season.  (SOF ¶ 66).  Still, neither insurer agreed to provide indemnity to Pavarini, either as Pavarini's own insurers or as the insurers for AWS and TCOE, the subcontractors that all agreed were responsible for the defective work.  (SOF ¶ 67).

Pursuant to the terms of AWS's subcontract, AWS was obligated to indemnify Pavarini for the costs of repairing damage caused by its defective work.  (SOF ¶ 68).  AWS lacked the resources to do that, and looked to its insurers – American Home and ACE – to provide coverage and pay Pavarini for the remediation.  (SOF ¶ 68).  The failure of American Home and ACE to recognize their coverage obligations to AWS resulted in AWS's failure to indemnify Pavarini pursuant to its subcontract obligations.  (SOF ¶ 69).  This led Pavarini to declare AWS in default of its contractual obligations on July 6, 2011.  (SOF ¶ 69).

As installation of the hurricane netting proceeded during the summer of 2011, Pavarini continued to pursue indemnity from the OCIP insurers.  (SOF ¶¶ 65, 70).  On August 8, 2011, Pavarini wrote to ACE, detailing the Panel System and again seeking indemnification.  (SOF ¶ 70).  Pavarini further advised that it intended to settle the Owner's claims and prevent further

damage by proceeding with the remediation unless the insurers told Pavarini, in writing, not to proceed.  (SOF ¶ 70).  ACE did not respond.  (SOF ¶ 70).

In September 2011, American Home made a payment of $436,600 to Pavarini, but that payment reflected only a portion of the costs already incurred by Pavarini in connection with the installation of the hurricane netting.[7]  (SOF ¶ 71).  Moreover, by that time, Pavarini was already beginning to incur costs for the Panel System.  (SOF ¶ 72).  In the face of these mounting costs, Pavarini was forced to seek interim funding from Steadfast.  (SOF ¶ 73).  Pavarini was able to seek this funding based on its prior default of AWS, which triggered coverage under the Subguard Policy.  (SOF ¶ 73).  While Pavarini and Steadfast recognized that the damages were the responsibility of the OCIP insurers, the dire condition of the building did not permit Pavarini to wait to begin the installation of the Panel System.  (SOF ¶ 74).

On October 5, 2011, Pavarini and Steadfast entered into a Payment Agreement, whereby Steadfast agreed to advance funds to Pavarini to reimburse approved remediation costs under the Subguard Policy on an ongoing basis.  (SOF ¶ 75).  The Payment Agreement also reaffirmed Steadfast's right under the Subguard Policy to seek subrogation from any party responsible for the damage.  (SOF ¶ 75).  Specifically, to the extent of all costs advanced by Steadfast to Pavarini, Steadfast became contractually subrogated to Pavarini's rights to seek indemnification for those costs.  (SOF ¶ 75).  Steadfast was thus able to step into Pavarini's shoes to pursue claims for those damages against ACE both directly (as Pavarini's excess CGL insurer under the Project OCIP) and indirectly (as AWS's and TCOE's excess CGL insurer under the Project OCIP).  (SOF ¶ 75).  In return for Steadfast's advance of funds, Pavarini agreed to continue to

---

[7]   American Home later made another payment of $194,500.76 in December 2011.  (SOF ¶ 71).  This second payment (for a total of $631,100.76) still failed to reimburse Pavarini's costs in connection with the hurricane netting, which ultimately exceeded $700,000.  (SOF ¶ 71).

pursue its preexisting claims against the OCIP insurers and repay Steadfast from any recovery obtained.  (SOF ¶ 75).

In December 2012, American Home acknowledged coverage and paid the remainder of its $2 million limit for Pavarini's claim.  (SOF ¶ 76).  Because American Home had previously paid a full $2 million occurrence limit to resolve a different claim at the Project, the $2 million payment toward this claim exhausted the aggregate limit of the American Home Policy.  (SOF ¶ 76).  ACE subsequently agreed to assume Pavarini's defense.  (SOF ¶ 69).  However, despite accepting Pavarini's defense, and despite American Home finding coverage under its nearly identical policy, ACE has refused to indemnify Pavarini for any property damage resulting from the defective work of AWS or TCOE.  (SOF ¶ 78).  ACE's refusal to indemnify Pavarini for the costs of repair – costs that are clearly covered by the ACE Policy – is a breach of its insurance contract.  (SOF ¶ 78).

Because of ACE's breach, Pavarini was forced to rely its own resources and on reimbursements from Steadfast to fund the remediation and save the Project.  (SOF ¶ 78). Pavarini's total costs related to the remediation have exceeded $25 million – an amount that ACE has never disputed.  (SOF ¶¶ 79, 92).  Steadfast stepped in to advance funds to Pavarini for many of those costs, nearly exhausting the $25 million Subguard Policy limit in the process. (SOF ¶ 79).  Steadfast then became contractually subrogated to Pavarini's rights to seek recovery of the funds advanced.  (SOF ¶ 80).  Steadfast subsequently assigned its rights of subrogation to Pavarini, so that Pavarini now has the right to, and does, seek all of the damages suffered by both Pavarini and Steadfast.  (SOF ¶ 81).  Setting aside interest, attorneys' fees, litigation-related expert fees, and other litigation expenses, and accounting for the payment by American Home and other recovered costs, Pavarini seeks a total of $23,116,798.44 in damages from ACE, as

explained in detail below.  (SOF ¶ 100).  This claim encompasses Pavarini's individual claims (based on Pavarini's own out-of-pocket costs), as well as Steadfast's assigned claims (based on Steadfast's payments to Pavarini).  Pavarini seeks recovery of all of these damages from ACE for itself and on behalf of Steadfast.

## III.   LEGAL STANDARDS

"Summary judgment is appropriate where the pleadings and supporting materials establish that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Romero v. Weiss Rohlig USA*, No. 13-cv-21284, 2015 WL 2337877, at *1 (S.D. Fla. May 13, 2015) (King, J.); *see* Fed. R. Civ. P. 56(a).  In opposing a motion for summary judgment, the nonmoving party "must show specific facts to support that there is a genuine dispute." *Id.*  The nonmoving party may not rely on the pleadings, but rather must demonstrate a genuine issue for trial through affidavits, depositions, interrogatory answers, and admissions.  *See* Fed. R. Civ. P. 56(c), (e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  The existence of a "mere scintilla" of evidence in support of the nonmoving party's position is insufficient; there must be evidence on which the finder of fact could reasonably find for the nonmoving party.  *Nat'l Cas. Co. v. Pickens*, 582 Fed. Appx. 839, 840-41 (11th Cir. 2014) (quoting *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990)).

Pavarini, individually and as assignee of Steadfast, has filed this action for declaratory judgment and breach of contract against ACE.  In order to prevail on its declaratory judgment claim, Pavarini must prove (1) an actual, present need for the declaration; (2) a present controversy as to a state of facts; (3) a privilege or right of the plaintiff is dependent on the facts and law applicable to the facts; (4) that there is another party with an actual, present, adverse, and antagonistic interest in the subject matter; and (5) the antagonistic and adverse interests are all before the court.  *City of Hollywood v. Petrosino*, 864 So. 2d 1175, 1177 (Fla. Dist. Ct. App.

2004).  In order to prevail on its breach of contract claim, Pavarini must prove (1) a valid contract; (2) a material breach; and (3) damages.  *Abbott Labs., Inc. v. Gen. Elec. Capital*, 765 So. 2d 737, 740 (Fla. Dist. Ct. App. 2000).

In an insurance coverage action, the insured generally bears the burden of showing that the basic insuring agreement of the policy at issue is triggered.  *See U.S. Concrete Pipe Co. v. Bould*, 437 So. 2d 1061, 1065 (Fla. 1983).  The burden then shifts to the insurer to prove that the loss is excluded from coverage under some policy exclusion.  *Mich. Millers Mut. Ins. Corp. v. Benfield*, 140 F.3d 915, 925 (11th Cir. 1998); *see* Joint Pretrial Stipulation, ECF No. 110, Apr. 24, 2015, at 8.  If the insurer satisfies its burden of demonstrating that an exclusion applies, then the burden shifts back to the insured to prove that an exception to the exclusion preserves coverage.  *See French Cuff, Ltd. v. Markel Am. Ins. Co.*, 322 Fed. Appx. 669, 671 (11th Cir. 2009); *see* Joint Pretrial Stipulation, at 8.

Under Florida law, "[i]nsurance contracts are construed according to their plain meaning, with any ambiguities construed against the insurer and in favor of coverage."  *U.S. Fire Ins. Co. v. J.S.U.B., Inc.* (hereinafter "*JSUB*"), 979 So. 2d 871, 877 (Fla. 2007); *see* Joint Pretrial Stipulation, at 8.  Policy provisions that seek to limit or avoid coverage are interpreted liberally in favor of the insured and strictly against the insurer who prepared the policy.  *Flores v. Allstate Ins. Co.*, 819 So. 2d 740, 744 (Fla. 2002); *see* Joint Pretrial Stipulation, at 8.  "[E]xclusions to coverage are construed even more strictly against the insurer . . . ."  *Id.*

## IV.   PAVARINI'S CLAIMS ARE COVERED BY THE PLAIN LANGUAGE OF THE ACE POLICY

### A.   The Basic Insuring Agreement Is Triggered

It is undisputed that ACE provided the first layer of excess CGL coverage to Pavarini, AWS, and TCOE under the Project OCIP, and that the ACE Policy is a valid contract of insurance.   (*See* SOF ¶¶ 17-18, 22-23).

The basic insuring agreement of the ACE Policy states, in relevant part:

> This insurance only applies to injury or damage covered by the UNDERLYING INSURANCE, and that takes place during OUR policy period . . . .

(SOF ¶ 82).  In other words, the ACE Policy incorporates the basic insuring agreement of the "UNDERLYING INSURANCE": the primary layer American Home Policy.  (SOF ¶¶ 83-84). The basic insuring agreement of the American Home Policy states, in relevant part:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of . . . "property damage" to which this insurance applies . . . .

(SOF ¶ 85).  "Property damage" includes both "[p]hysical injury to tangible property, including all resulting loss of use of that property . . . [and l]oss of use of tangible property that is not physically injured . . . ."  (SOF ¶ 87).  For coverage to be afforded, "property damage" must be caused by an "occurrence" during the policy period.  (SOF ¶ 86).  An "occurrence" is "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  (SOF ¶ 88).

Therefore, the basic insuring agreement is triggered if recovery is sought for damages because of either (1) physical injury to tangible property or (2) loss of use of tangible property, caused by continuous or repeated exposure to the same general harmful conditions.  That standard is easily satisfied here.

### 1. There was "property damage" at the Project

There is no question that there was "property damage" at the Project, including widespread "physical injury" to the building.  Among other things, the defective work of AWS and TCOE caused excessive movement of certain building elements.  (SOF ¶¶ 39, 50, 52).  This alone constitutes property damage.  *See, e.g., Greystone Constr., Inc. v. Nat'l Fire & Marine Ins. Co.*, 661 F.3d 1272, 1286 (10th Cir. 2011) (movement of basement floor); *Webster v. Acadia Ins. Co.*, 934 A.2d 567, 571-72 (N.H. 2007) (lateral movement of building element).

In addition, and alarmingly, the movement caused cracking in the concrete framework of the building – including concrete columns, beams, and shear walls – that was worsening and beginning to compromise the building's structural integrity.  (SOF ¶¶ 48-52).  The structural cracking and movement caused the stucco façade to crack and debond so severely that pieces of stucco began falling off of the building.  (SOF ¶¶ 50, 53).  The resulting life safety concern required that parts of the building be closed, leading to the "loss of use" of those areas.  (SOF ¶¶ 53-54).  The defective work also caused cracking in the mechanical penthouse enclosure on the roof, which subsequently led to water intrusion.  (SOF ¶ 50).  Therefore, there was clearly "property damage" within the terms of the ACE Policy.

### 2. The "property damage" was caused by an "occurrence"

The "property damage" at the Project was caused by an "occurrence."  It is well settled under Florida law that defective construction by a subcontractor that causes physical injury to the work of other subcontractors or other building components constitutes an "occurrence."  *See Auto-Owners Ins. Co. v. Pozzi Window Co.*, 984 So. 2d 1241, 1247 (Fla. 2008) (discussing *JSUB*, 979 So. 2d at 875-77, 883-88).  Here, the undisputed facts show that AWS and TCOE performed defective work by failing to properly install reinforcing steel within the CMU walls and concrete columns, beams, and shear walls.  (SOF ¶ 39, 48-49).  The undisputed facts further

show that the defective work of AWS and TCOE caused the excessive movement of building components; the cracking of concrete columns, beams, and shear walls; the cracking and debonding of stucco; and the cracking of the roof, leading to water intrusion. (SOF ¶¶ 39, 49-52). Finally, the undisputed facts show that the stucco, concrete columns, beams, and shear walls, and mechanical penthouse enclosure were not the work of either AWS or TCOE. (SOF ¶¶ 12-16). As such, the "property damage" at the Project was clearly caused by an "occurrence" within the terms of the ACE Policy.

### 3. The "property damage" occurred during the policy period

Similarly, there is no question that the "property damage" occurred within the policy period. The OCIP insurance policies provided coverage for ongoing construction through as late as May 31, 2008. (SOF ¶¶ 21, 23). On May 22, 2008, the record date of substantial completion, the entire building was under a TCO without qualification, and the building could be put to its intended use. (SOF ¶¶ 31-33). Substantial completion triggered the five year products-completed operations extension under the American Home and ACE Policies, which ran from May 22, 2008 through May 22, 2013. (SOF ¶¶ 34-35). "Property damage" caused by the defective work of AWS and TCOE clearly occurred during the products-completed operations extension. Specifically, Pavarini first had knowledge of the defective work and significant resulting damages from Bureau Veritas's June 1, 2009 report. (SOF ¶ 40). The Owner then served its § 558 Notice of damage in December 2010. (SOF ¶ 46). Moreover, ACE's adjuster Gary Lupien specifically acknowledged in a letter to Pavarini that the damages fell squarely within the ACE Policy:

> We understand the date for substantial completion of the Project was May 22, 2008. The extension period under both the [American Home] and ACE policies commences when the portion of the project is put to its intended use or a temporary or permanent certificate of occupancy is issued, which we understand here was May 22, 2008.

(SOF ¶ 35).  The undisputed facts thus show that the "property damage" occurred during the period of the ACE Policy.

There is simply no question that (1) there was "property damage" at the Project (2) that was caused by an occurrence (3) during the five year products-completed operations extension of the ACE Policy.  Consequently, Pavarini has met its burden of showing that coverage is triggered under the basic insuring agreement of the ACE Policy.

**B.       The Subcontractor Exception to Exclusion l Applies**

While ACE bears the burden of proving any exclusions to coverage, Pavarini concedes that one exclusion – Exclusion l – does apply to Pavarini's claims.  However, the clear language of the ACE Policy, the relevant law, and the undisputed facts show that an exception to Exclusion l, known as the "subcontractor exception," also applies, maintaining coverage for Pavarini's claims.

Exclusion l states that the ACE Policy does not apply to:

> "Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

(SOF ¶ 89).  "Your work" is defined as work performed either by the insured or on the insured's behalf.  (SOF ¶ 90).  Here, Pavarini's "work" was the Project.  Exclusion l therefore seems to exclude coverage for any property damage to the completed Project.  But the analysis does not stop there.  Exclusion l includes an important exception that is commonly referred to as the "subcontractor exception" to the "your work" exclusion.  The subcontractor exception states that:

> This exclusion *does not apply* if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

(SOF ¶ 89 (emphasis added)).   In other words, the exception unambiguously provides that Exclusion l does not apply where the damaged work, or the work out of which the damage arises, was performed on Pavarini's behalf by a subcontractor.

Here, it is undisputed that both the damaged work and the work out of which the damage arises were performed by subcontractors.  (SOF ¶¶ 11-16).  Indeed, that must be case because Pavarini itself performed no actual construction on the Project – all of the construction was performed by subcontractors.  (SOF ¶ 11).  Specifically, the work that caused damage to the Project (missing and improperly installed reinforcing steel) was performed on Pavarini's behalf by AWS and TCOE.  (SOF ¶¶ 12-13, 67).  None of the costs at issue here were incurred to repair that defective work.  (SOF ¶ 61, 91).  And the work that was damaged, e.g., the completed building, stucco, cast-in-place concrete, and the mechanical penthouse enclosure, was performed by other subcontractors.  (SOF ¶¶ 14-16).  Consequently, the undisputed facts show that the exception to Exclusion l preserves coverage for Pavarini's claims.

This result is consistent with Florida law.  The Florida Supreme Court in *JSUB* confirmed that where a subcontractor's defective work damages the completed project, there is coverage for the damage to the completed project.  *See JSUB*, 979 So. 2d at 875-76, 889 (coverage for structural damage to completed homes caused by defective work of soil subcontractor); *Carithers v. Mid-Continent Casualty Co.*, 782 F.3d 1240, 1251 (11th Cir. 2015) (coverage for wood rot in garage of completed home caused by defective work of balcony subcontractor).

Pavarini has thus satisfied its burden of proving that the basic insuring agreement of the ACE Policy is triggered, and that the subcontractor exception to Exclusion l preserves coverage for damages to the completed project resulting from the defective work of subcontractors.  Accordingly, Pavarini's claims are covered by the plain language of the ACE Policy.  Because the American Home primary layer policy in the OCIP has been exhausted, ACE owes coverage here for the remainder of the covered damages.

V.     **ACE IS LIABLE FOR PAVARINI'S AND STEADFAST'S DAMAGES**

As the discussion above demonstrates, where there has been physical damage to or loss of use of a building due to the defective work of a subcontractor, a general contractor has coverage for damages caused by the defective work.   And that is precisely the case here. Pavarini, individually and as assignee of Steadfast, seeks coverage for damages incurred because of physical damage to and loss of use of the Project, due to the defective work of two subcontractors:  AWS and TCOE.  The ACE Policy, like the American Home Policy, provides coverage for the costs incurred by Pavarini and Steadfast in connection with the repair of that damage.

A.     <u>**Damages Because of Property Damage**</u>

Under the terms of the American Home and ACE Policies, once the basic insuring agreement has been triggered, as the policies were here, the insurer is liable to pay all damages "because of" property damage.  (SOF ¶ 85).  Accordingly, the ACE Policy provides coverage not only for the costs to repair resulting property damage itself, but also for all damages arising from or attributable to the property damage – including consequential damages.  *See Am. Home Assurance Co. v. Libbey-Owens-Ford Co.*, 786 F.2d 22, 26-27 (1st Cir. 1986) (coverage for all damages "arising from" or "as a consequence of" property damage).[8]

Here, all of damages that have been incurred by Pavarini and Steadfast in connection with the Project arise from or are "because of" the property damage caused by the defective work

---

[8]   Covered damages thus include, among other things, delay costs, overhead expenses, additional labor costs, interest, lost profits, diminution in value, and any other "economic" losses that flow from injury to property.  *See, e.g., Mid-Continent Cas. Co. v. Circle S Feed Store, LLC*, 754 F.3d 1175, 1186 (10th Cir. 2014) (diminution); *Nat'l Union Fire Ins. Co. of Pittsburgh v. Puget Plastics Corp.*, 532 F.3d 398, 403 (5th Cir. 2008) (lost profits); *U.S. Fid. & Guar. Co. v. Andalusia Ready Mix, Inc.*, 436 So. 2d 868, 872 (Ala. 1983) (labor and material costs); *DiMambro-Northend Assocs. v. United Constr. Inc.*, 397 N.W. 2d 547, 549 (Mich. Ct. App. 1986) (delay, overhead, lost profits, interest); *U.S. Fid. & Guar. Co. v. Nev. Cement Co.*, 561 P.2d 1335, 1336-37 (Nev. 1977) (delay and construction expenses).

of AWS and TCOE. (SOF ¶ 91). Such damages include, among other things, the expert costs associated with investigating the damage and designing a plan of remediation; the costs associated with installing the hurricane netting to prevent stucco from falling from the building, causing bodily injury and additional property loss; the costs of installing the Panel System to remedy the existing damage and prevent further damage; and the costs to repair the mechanical penthouse enclosure on the roof. (SOF ¶ 91).

ACE has argued in previous briefing that under *JSUB* Pavarini is not entitled to coverage for costs to repair defective work. While that is not a correct reading of Florida law, *see, e.g.*, *Carithers*, 782 F.3d at 1251, it is irrelevant to the damage analysis in this case. Here, there is simply no dispute that Pavarini did *not* incur costs to repair the defective work of AWS and TCOE. Reinforcing steel was neither added where it was missing, nor relocated where it was misplaced. (SOF ¶ 61). The defective work of both AWS and TCOE remains within the building, as originally installed. (SOF ¶ 61). Instead, the Panel System addressed the extensive damage to the Project caused by the defective work. (SOF ¶¶ 57-58). As this Court has previously recognized, such facts clearly establish that Pavarini seeks coverage for "property damage caused by defective work – as opposed to repairs of the defective work itself." Order Denying Defendant's Motions for Summary Judgment, ECF No. 104, Feb. 25, 2015, at 5.

American Home recognized that Pavarini's costs were covered under its policy and ultimately paid its full remaining $2 million policy limit, which paid for, among other things, the cost of the hurricane netting, and some costs of the Panel System. (SOF ¶¶ 71, 76). Pavarini, individually and as assignee of Steadfast, seeks recovery from ACE of all remaining damages incurred by Pavarini and Steadfast. Excluding interest, attorneys' fees, litigation-related expert fees, and other litigation expenses, and recognizing American Home's payment and other

recovered costs, Pavarini seeks a total of $23,116,798.44 in damages caused by the defective work of AWS and TCOE. Importantly, ACE has never disputed that Pavarini incurred these costs, only whether they are covered. (SOF ¶¶ 79, 92).

Throughout the course of the remediation, Pavarini has made 33 separate submissions to Steadfast. (SOF ¶ 92). The submissions collectively detail Pavarini's costs and include all of the invoices supporting the costs incurred. (SOF ¶ 92). Each submission also included a detailed "Reconciliation" spreadsheet, a cumulative and detailed summary of all costs incurred by Pavarini. (SOF ¶ 92). Steadfast reviewed Pavarini's submissions in detail and determined which costs would be reimbursed under the Subguard Policy and pursuant to the Payment Agreement. (SOF ¶ 93). Excluding litigation-related expenses, Steadfast has reimbursed $23,399,974.05 of Pavarini's remediation costs. (SOF ¶ 94). However, in accordance with the Payment Agreement, Pavarini repaid to Steadfast the $2 million from American Home and $4,676.40 in salvage costs from the sale of equipment. (SOF ¶ 95). This results in a total of $21,395,297.65 in damages advanced to Pavarini by Steadfast to reimburse remediation costs, and now sought by Pavarini as assignee of Steadfast's subrogation rights. (SOF ¶ 95).

Pavarini separately seeks a total of $1,721,500.79 in damages not reimbursed from any other source as of April 21, 2015. (SOF ¶ 99). Excluding litigation-related expenses, Pavarini has incurred $566,383.79 in costs that have not yet been reimbursed by Steadfast. (SOF ¶ 96). Pavarini also has projected remaining costs of $205,117, which have not yet been submitted to Steadfast due to the inherent delay in the reimbursement process. (SOF ¶¶ 93, 97). In addition, because Pavarini was forced to seek funding from Steadfast, Pavarini was required to incur $950,000 in deductible and co-payments to receive funds under the Subguard Policy. (SOF ¶

98). Pavarini would not have incurred these costs but for ACE's breach of its obligations under the ACE Policy. (SOF ¶ 78).

The total damages sought from ACE, exclusive of interest and litigation-related expenses, are thus $23,116,798.44 ($21,395,297.65 in costs reimbursed by Steadfast plus $1,721,500.79 in costs not reimbursed from any other source). The damages sought by Pavarini, individually and as assignee of Steadfast, were caused by the defective work of AWS and TCOE and are covered under the terms of the ACE Policy. As noted, ACE has never disputed the amount of the costs incurred by Pavarini and Steadfast in connection with the remediation. (SOF ¶¶ 79, 92). Pavarini is therefore entitled to summary judgment awarding it the full amount of these damages.

### B.    Costs Incurred to Mitigate Damages Are Covered

As described above, Pavarini is entitled to summary judgment awarding the full amount of its damages "because of . . . 'property damage'" caused by the defective work of AWS and TCOE. (SOF ¶ 85). Pavarini notes that it is entitled to summary judgment on an alternative (additional) basis; namely, because its damages were incurred to prevent (mitigate against) further damage to the Project.

In addition to the coverage provided by the clear terms of the ACE Policy for damages that Pavarini incurred "because of" the property damage, it is well settled that, where property damage is ongoing and worsening, costs incurred to mitigate against additional property damage are also covered.[9] Indeed, "[t]o find otherwise would require the insured to intentionally allow

---

[9]    *See, e.g., AIU Ins. Co. v. Super. Ct.*, 799 P.2d 1253, 1272 (Cal. 1990) (coverage for "remedial and mitigative actions"); *Globe Indem. Co. v. State*, 118 Cal. Rptr. 75, 79 (Ct. App. 1974) (explaining that it would "seem strangely incongruous" to the insured "that his policy would cover him for damages to tangible property destroyed through his negligence in allowing a fire to escape but not for the sums incurred in mitigating such damages by suppressing the fire"); *Am. Econ. Ins. Co. v. Commons*, 552 P.2d 612, 613-14 (Or. Ct. App. 1976) (adopting rationale of *Globe Indem.*); *Aronson Assocs., Inc. v. Pa. Nat'l Mut. Cas. Ins. Co.*, 14 Pa. D. &

property damage or bodily harm to occur for the damages to be covered." *Big-D Constr. Corp. v. Take it for Granite Too*, 917 F. Supp. 2d 1096, 1109 (D. Nev. 2013). As explained by one court:

> It is folly to argue that if a policy owner does nothing and thereby permits the piling up of mountainous claims at the eventual expense of the insurance carrier, he will be held harmless of all liability, but if he makes a reasonable expenditure and prevents a catastrophe he must do so at his own cost and expense.

*Leebov v. U.S. Fid. & Guar. Co.*, 165 A.2d 82, 84 (Pa. 1960).

Here, there is no dispute that the defective work of two subcontractors (the missing and improperly installed reinforcing steel) caused damage to other non-defective work of other subcontractors (including the stucco, concrete columns, beams, and shear walls, and the mechanical penthouse enclosure on the roof). (SOF ¶ 12-16, 39, 48-52). The undisputed facts further show that the damage would have continued to worsen without a comprehensive solution. (SOF ¶ 52). Indeed, if left unabated, the conditions at the Project eventually would have resulted in the forced evacuation of the building and/or a catastrophic failure of the building's structure. (SOF ¶¶ 57-58). ACE has conceded that the building's structural elements were suffering worsening physical damage. (SOF ¶¶ 51-52). If there had been an evacuation (loss of use) or a catastrophic failure of the building (physical injury), ACE clearly would have been liable for those costs. Accordingly, because the costs incurred by Pavarini for the remediation not only repaired the resulting property damage, but also mitigated against further damage – preventing potentially catastrophic damage and allowing continued occupancy of the building – ACE is liable for the damages incurred by Pavarini and Steadfast.

---

C.3d 1, 7 (C.P. 1977), *aff'd* 422 A.2d 689 (Pa. Super. 1979) (per curiam) ("preventive measures can be recovered where they are required to protect against a third person being harmed.").

## VI.     PAVARINI IS ENTITLED TO SUMMARY JUDGMENT ON ITS CLAIMS

Pavarini has brought three claims against ACE in this litigation: Count I for Declaratory Judgment, Count II for Breach of Contract (by Pavarini individually), and Count III for Breach of Contract (as assignee and for the use and benefit of Steadfast).  Based on the detailed discussion of the undisputed facts and law above, Pavarini is entitled to entry of judgment on each of its claims.

As to Count I for Declaratory Judgment, Pavarini has an actual, present need for a declaratory judgment because of the more than $23 million at issue.  It is undisputed that there is a present controversy between Pavarini and ACE as to whether Pavarini's damages are covered by the ACE Policy, even though the material facts are not in dispute.  It is also undisputed that Pavarini's rights to payment under the terms of the ACE Policy depend on the facts and the law applicable to the facts.  Finally, it is undisputed that ACE has an actual, present, adverse interest in the subject matter in that it is trying to avoid coverage under its Policy, and that those interests are all before the court.  Pavarini is therefore entitled to summary judgment on its claim for Declaratory Judgment.

As to Counts II and III for Breach of Contract, there is no dispute that the ACE Policy is a valid contract between ACE and Pavarini.  As described in detail above, the defective work of Pavarini's subcontractors caused damage to other, non-defective building components, which triggered coverage under the American Home Policy.  American Home paid a full $2 million per occurrence policy limit, exhausting its coverage and triggering coverage under the ACE Policy. ACE was obligated to provide coverage for Pavarini's damages, both as Pavarini's excess insurer and as the excess insurer to AWS and TCOE, which had contractual indemnity obligations to Pavarini.  Because no exclusion or other term of the ACE Policy limits coverage, ACE's failure to pay more than $23 million in covered damages – a figure within its policy limits – is a

material breach of ACE Policy.  As a direct and proximate result of that breach, Pavarini and Steadfast have suffered damages.  Pavarini is therefore entitled to summary judgment on both of its claims for Breach of Contract, awarding all of the damages sought.

## VII.   ACE IS LIABLE FOR STATUTORY PREJUDGMENT INTEREST

Pavarini is entitled to recover statutory prejudgment interest on its damages.  The rate of prejudgment interest in this matter is set pursuant to Florida Statutes, §§ 687.01 (Rate of interest in absence of contract) and 55.03 (Judgments; rate of interest, generally).  Once the rate of prejudgment interest is "obtained based on the date of loss, it should remain the same." *Regions Bank v. Maroone Chevrolet, L.L.C.*, 118 So. 3d 251, 258 (Fla. Dist. Ct. App. 2013).  For insurance coverage actions, the date of loss is the time payment is due under the terms of the insurance policy.  *Chalfonte Condo. Apartment Ass'n, Inc. v. QBE Ins. Corp.*, 526 F. Supp. 2d 1251, 1261-62 (S.D. Fla. 2007); *Owners Ins. Co. v. Hartford Fire Ins. Co.*, 884 So. 2d 382, 383 (Fla. Dist. Ct. App. 2004) (prejudgment interest calculated based on date proceeds for loss would have been due under CGL policy, not the date of payment by another insurance company).  The total amount of interest accrued to date is in excess of $2 million.  Though the final amount of interest must be computed based on the Court's award, Pavarini requests that the Court award summary judgment to Pavarini, finding that Pavarini is entitled to an award of prejudgment interest on its claims, with the amount to be determined at a later date.

## VIII.   ACE IS LIABLE FOR STATUTORY ATTORNEYS' FEES AND COSTS

Pursuant to Florida Statutes, § 627.428, Pavarini is entitled to recover attorneys' fees and costs incurred in prosecuting its claims against ACE.  Pavarini is entitled to recover its attorneys' fees and costs even if Pavarini is not ultimately successful on all of the points it argues.  *See Rodriguez v. Travelers Ins. Co.*, 367 So. 2d 687, 691 (Fla. Dist. Ct. App. 1979).  Likewise, Pavarini is entitled to recover its fees and costs without a showing of bad faith. *See id.*; Fla. Stat.

§ 627.428. The parties previously agreed that Pavarini's fees and costs would be the subject of a post-trial motion pursuant to Federal Rule of Civil Procedure 54(d), so that the Court can separately determine the amount and reasonableness of those fees and costs in light of the Court's ruling on Pavarini's claims. While the ultimate amount of fees and costs is subject to a post-trial motion, Pavarini requests that the Court award summary judgment to Pavarini, finding that Pavarini is entitled to an award of attorneys' fees and costs under Florida Statutes, § 627.428, with the amount to be determined at a later date.

## IX.    CONCLUSION

For the reasons stated above, and because there are no material facts in dispute, summary judgment should be entered in favor of Pavarini, individually and for the use and benefit of Steadfast. In accordance with the attached Proposed Findings of Fact and Conclusions of Law, Pavarini respectfully requests that the Court enter an order:

1. Granting summary judgment in Pavarini's favor on Count I for Declaratory Judgment and Counts II and III for Breach of Contract;

2. Finding as a matter of law that ACE owes a duty to indemnify Pavarini for the costs to resolve the Owner's claim against Pavarini for the repair of property damage to the Project resulting from the defective work of AWS and TCOE;

3. Finding as a matter of law that ACE owes a duty to indemnify Pavarini for costs to mitigate against further property damage to the Project;

4. Finding as a matter of law that ACE breached its obligations to Pavarini by failing to indemnify Pavarini for the costs to resolve the Owner's claim against Pavarini for the repair of property damage and/or to mitigate against further damage;

5.  Finding as a matter of law that Steadfast maintains rights to subrogate against responsible parties to recover amounts paid, which rights it validly assigned to Pavarini;

6.  Finding as a matter of law that Pavarini is entitled to recover all attorneys' fees, expert fees, and costs pursuant to Florida Statutes, § 627.428;

7.  Finding as a matter of law that Pavarini is entitled to recover prejudgment interest on all damages awarded pursuant to Florida Statutes, §§ 687.01 and 55.03;

8.  Finding that the costs to repair the damage at the Project and mitigate against further damage total $23,116,798.44, exclusive of legal fees, expert fees, and interest;

9.  Awarding Pavarini, for itself and for the use and benefit of Steadfast, damages in the amount of $23,116,798.44, plus prejudgment interest and attorneys' fees, expert fees, and costs, to be determined in subsequent briefing or in a subsequent proceeding; and

10. Granting such other and further relief as the Court deems just and proper.

Dated:  July 13, 2015                    Respectfully  submitted,

                                         By:  /s/ Peter F. Valori
                                         Peter F. Valori (Florida  Bar No. 0043516)
                                         Russell  Landy (Florida  Bar No. 0044417)
                                         DAMIAN  & VALORI
                                         1000 Brickell  Avenue,  Suite 1020
                                         Miami,  Florida  33131
                                         Telephone:  (305) 371-3960
                                         Facsimile:  (305) 371-3965
                                         Email:  pvalori@dvllp.com
                                         Email:  rlandy@dvllp.com

                                         and

                                         David T. Dekker (admitted  *pro hac vice*)
                                         Melissa  C. Lesmes (admitted  *pro hac vice*)
                                         Laura Freid-Studlo  (admitted  *pro hac vice*)
                                         Stephen  S. Asay (admitted  *pro hac vice*)
                                         PILLSBURY  WINTHROP  SHAW PITTMAN  LLP
                                         1200 Seventeenth  Street, NW
                                         Washington,  DC 20036
                                         Telephone:  (202) 663-8000
                                         Facsimile:  (202) 663-8007
                                         Email:  david.dekker@pillsburylaw.com
                                         Email:  melissa.lesmes@pillsburylaw.com
                                         Email:  laura.freidstudlo@pillsburylaw.com
                                         Email:  stephen.asay@pillsburylaw.com

                                         *Attorneys for Pavarini Construction Co. (SE), Inc.*

## CERTIFICATE  OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via the

CM/ECF system on this 13th day of July 2015 upon:


Maritza Peña, Esq.
Joel D. Adler, Esq.
MARLOW ADLER ABRAMS
NEWMAN & LEWIS
Counsel for Defendant ACE
4000 Ponce de Leon Boulevard, Suite 570
Coral Gables, FL 33146
Telephone: (305) 446-0500
Facsimile: (305) 446-3667
mpena@marlowadler.com
jadler@marlowadler.com


                                         /s/ Peter F. Valori
                                        Peter F. Valori